**FILED**

JUN 18 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Sebastian Rako
88 S 3rd Street #229
San Jose, CA 95113
(310) 893-3445
rakovvmwareetal@gmail.com
Plaintiff Pro Se

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

C 25 05142

SVK

| | |
|---|---|
| SEBASTIAN RAKO | Case No. |
| Plaintiff, | COMPLAINT FOR: |
| v. | Retaliation in Violation of False Claims Act (31 U.S.C. § 3730(h)) |
| VMWARE LLC, a Delaware limited liability company; KAISER ALUMINUM CORPORATION, a Delaware corporation; MICHAEL BREWSTER, an individual; JEREMY HOKE, an individual; MIKE WOOD, an individual; TAMI MILLS, an individual. | Retaliation in Violation of California Labor Code § 1102.5 |
| | Civil Conspiracy to Retaliate Against Whistleblower and Facilitate Wire Fraud (Derivative of Labor Code § 1102.5 and 31 U.S.C. § 3730(h)) |
| Defendants. | Wrongful Termination in Violation of Public Policy (Tameny Claim) |
| | DEMAND FOR JURY TRIAL |

# INTRODUCTION

1.  This action arises from Plaintiff's termination following his refusal to comply with a direct managerial order to facilitate ongoing wire fraud. Upon discovering that Kaiser Aluminum Corporation had defrauded VMware LLC of almost $1 million through six years of systematically falsified licensing reports, Plaintiff promptly reported the misconduct to VMware's Compliance Lead for the Americas. One week later, his manager directed him to accept Kaiser's fraudulent data and proceed with the license renewal. When Plaintiff declined to participate in what he reasonably believed constituted felony wire fraud—explicitly stating, "You cannot order me to break the law"—he was suspended within days and terminated shortly thereafter.

2.  The fraud was particularly egregious given Kaiser's role as a critical subcontractor in the F-35 Joint Strike Fighter program. At the time of Plaintiff's report, Kaiser was operating manufacturing systems with over 1,000 known cybersecurity vulnerabilities while handling Controlled Unclassified Information (CUI) in violation of federal defense contractor requirements. Their license fraud—transmitting false entitlement data across state lines for six consecutive years—occurred within this high-security context, rendering Plaintiff's participation potentially criminal under multiple federal statutes.

3.  Within twenty-four hours of removing Plaintiff, VMware management and Kaiser personnel coordinated to resume their six-year licensing scheme using the same false data Plaintiff had refused to process. The transaction was conducted in an email thread titled "Kaiser Aluminum VMware Renewal and Licensing Compliance," where Plaintiff had written: "Kaiser Aluminum as an entity is not in compliance. This needs to be resolved asap." The renewal was completed in seven days—despite the process typically requiring thirty or more. The fraud was executed directly beneath the evidence exposing it, after eliminating the only employee who attempted to stop it, and later terminating him without documentation. VMware has since refused to produce any termination records, even in response to counsel.

## JURISDICTION AND VENUE

4. **Federal-question jurisdiction.** This Court has original jurisdiction under 28 U.S.C. § 1331 because the First Cause of Action arises under the False Claims Act, 31 U.S.C. § 3730(h).

5. **Supplemental jurisdiction.** All state-law claims form part of the same case or controversy and are subject to supplemental jurisdiction under 28 U.S.C. § 1367(a).

6. **Venue.** Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) and (b)(3) because a substantial part of the events giving rise to these claims occurred here and all Defendants are subject to this Court's personal jurisdiction:

   a) VMware LLC maintains its principal place of business in Palo Alto, California, where the key compliance, human-resources, and account-management decisions at issue were made.

   a) Managers Jeremy Hoke and Michael Brewster directed the alleged retaliation through VMware's Palo Alto chain of command. Hoke resides in Phoenix, Arizona; Brewster resides in San Diego, California (Southern District). Both purposefully availed themselves of this forum by routing all material decisions through VMware's headquarters in Palo Alto.

   b) Kaiser Aluminum Corporation and Mike Wood purposefully directed their conduct toward California:

      i. They transmitted licensing and renewal data to VMware's Palo Alto headquarters;

      ii. Wood requested Plaintiff's removal through California-based managers; and

      iii. They conspired with those managers to finalize the renewal.

      iv. By routing the renewal through VMware's Palo Alto finance and legal systems—and collaborating with a California-based sales representative

3

COMPLAINT

(Plaintiff), a California-based renewal engineer (James Reale), and Kaiser's California point-of-contact (Tami Mills in Foothill Ranch, CA)—Wood ensured that pricing approval, contract execution, and final acceptance all occurred in California, making specific jurisdiction in this District entirely foreseeable.

b) On information and belief, Tami Mills resides in Foothill Ranch, California, and served as Kaiser's in-state liaison for the renewal. Her participation independently supports venue and personal jurisdiction in this District.

c) In the alternative, venue is proper under 28 U.S.C. § 1391(b)(3) because VMware resides in this District and no other single district would have personal jurisdiction over all defendants for all claims.

## PARTIES

7.  Plaintiff Sebastian Rako is an Austrian citizen and U.S. permanent resident. During the events described herein he resided in Los Angeles, California (Central District); he now resides in San Jose, California (Northern District). At all relevant times Plaintiff was employed by VMware LLC as an enterprise-technology sales professional specializing in hybrid cloud solutions for regulated industries.

8.  Defendant VMware LLC ("VMware") is a Delaware limited liability company with its principal place of business at 3401 Hillview Avenue, Palo Alto, California 94304. VMware was Plaintiff's employer at all relevant times.

9.  Defendant Jeremy Hoke ("Hoke") is, on information and belief, a resident of Phoenix, Arizona. He served as a VMware sales manager with supervisory authority over Plaintiff and participated in the retaliatory acts alleged herein.

10. Defendant Michael Brewster ("Brewster") is, on information and belief, a resident of San Diego, California. He recruited Plaintiff to VMware, held supervisory authority over him, and participated in the retaliatory acts alleged herein.

COMPLAINT

11. Defendant Kaiser Aluminum Corporation ("Kaiser") is a Delaware corporation with its principal executive offices at 1550 W. McEwen Drive, Suite 500, Franklin, Tennessee 37067. Kaiser supplies aluminum components for the F-35 Joint Strike Fighter program and handles Controlled Unclassified Information subject to federal cybersecurity mandates.

12. Defendant Tami "Tammy" Mills ("Mills") is, on information and belief, a resident of Foothill Ranch, CA. At all relevant times she was Kaiser's Director of Technology Operations and participated in the retaliatory acts alleged herein.

13. Defendant Mike Wood ("Wood") is, on information and belief, a resident of Spokane, Washington. At all relevant times he was IT Manager (later Senior Manager) for Kaiser's Trentwood facility and oversaw licensing compliance and VMware infrastructure.

## FACTS

### A.     Background and VMware Employment

14. Plaintiff is a recognized enterprise technologist with nearly thirty years of experience delivering critical infrastructure across regulated industries. His work includes global data center migrations for DHL (2006–2008) and Dell Europe/Asia (2008–2009); HIPAA- and HITECH-compliant disaster recovery systems for Cedars-Sinai (2009–2011); and FDA-compliant ERP architecture for ResMed's medical device operations (2020–2021). He has architected platforms aligned with SOX 404, FDA 21 CFR Part 11 and Part 820 cGMP, as well as U.S. and EU financial and federal security frameworks.

15. Plaintiff has held senior roles at Hewlett-Packard, EMC, Cisco, Trace3, and Dell EMC, and served as a VCE vArchitect—an expert role within the joint VMware-Cisco-EMC venture responsible for delivering mission-critical infrastructure at the Fortune 500 level. That role, and the career that preceded and followed it, reflect a deep fluency in aligning complex technology deployments with regulatory mandates. This foundation equipped Plaintiff to immediately recognize the federal-law violations he later uncovered at Kaiser Aluminum. Plaintiff currently serves as a Senior Solutions Architect at Hewlett-Packard Enterprise in Silicon Valley.

COMPLAINT

16. In August 2021, Michael Brewster recruited Plaintiff to VMware on a compensation package valued at $355,000 OTE (50 percent base, 50 percent commission). During their prior tenure at Dell EMC, the two had clashed over regulatory-compliance shortcuts, and Brewster was well aware of Plaintiff's uncompromising stance. His decision to rehire Plaintiff just eighteen months later suggests he valued that rigor. Upon joining, Plaintiff inherited a territory of long-neglected commercial accounts, many of which were already exploring migrations to AWS or Microsoft Azure.

17. During routine deal reviews, Plaintiff uncovered systemic control lapses within VMware's commercial-sales workflow that presented clear Sarbanes-Oxley (SOX) risk. Sales teams frequently issued quotes based on unverified usage estimates and disclosed unapproved pricing directly to customers. A recurring tactic—internally dubbed "backing into a deal"—involved securing a customer's verbal "yes" on terms not yet cleared, then telling approvers, "They'll sign today if we match this price." Approvers were thus pressured to ratify pricing decisions after the fact, bypassing established pricing-governance checkpoints and compromising SOX § 404 control integrity. Plaintiff also noted mismatches between VMware's published Enterprise License Agreement (ELA) discount matrices and the deeper discounts embedded in specific SKUs, creating additional SOX exposure through inconsistent pricing representations.

18. Plaintiff conveyed these control failures to Brewster during a phone conversation, warning: "If anything goes wrong, we could be exposed to felony liability simply for being linked to misconduct by people we hardly know." Brewster responded, "You're scaring me," yet implemented no corrective measures. This silence ran counter to VMware's own Respectful Workplace Policy—which every employee must acknowledge—which forbids retaliation and obliges management to address reported compliance risks.

19. On 10 March 2022, after VMware's four-week quoting delay had already cost the Cetera Financial deal—and with Brightview likely to follow—Plaintiff sent senior leadership a detailed e-mail cataloguing the process failures and the revenue at risk. Despite having no

COMPLAINT

dedicated solutions engineer or reliable inside-sales support, Plaintiff had independently identified roughly $50 million in predictable bookings over the next three years. The pipeline consisted of customers already enrolled in AWS Enterprise Discount Programs who wanted to deploy VMware Cloud on AWS. Because those projects would be funded from pre-committed AWS spend, they required no new capital budgeting and represented one of VMware's lowest-friction, highest-margin commercial opportunities.

20. Plaintiff's 10 March 2022 e-mail flagged several deals slipping because VMware's four-week quote delays—Kaiser Aluminum among them—and calculated the revenue at risk. Applying a conservative 50–60 percent conversion rate for workloads already funded under AWS Enterprise Discount Programs, Plaintiff projected $8–10 million in annual net bookings, or 400–500 percent of his $2 million quota. Brewster's lack of response was perplexing: both he and EMC had lured Plaintiff from Cisco precisely for his reputation as a business-strategy trailblazer whose "disproportionate-value" methods were showcased on Cisco's internal TV and podcast network, where he trained the global sales force. Despite that track record—and a documented $10 million per year strong upside—leadership remained silent. Plaintiff's follow-up text to Brewster went unanswered, and no corrective action was taken.

21. The strain of uncovering fraud while managing a dysfunctional territory took an immediate and severe toll on Plaintiff's health. On May 4, 2022, Plaintiff formally reported Kaiser Aluminum's licensing violations to VMware's Compliance department. Within 48 hours, he began experiencing acute abdominal pain and sought emergency medical care. The condition worsened, and in the early morning hours of May 9, he was transported by ambulance to the emergency department at UCLA.

22. While still recovering, Plaintiff received a directive from Manager Jeremy Hoke on May 11, instructing him to proceed with accepting Kaiser's knowingly false licensing data. The pain persisted throughout the summer of 2022, contributing to escalating physical and psychological distress. In February 2023, Plaintiff experienced a psychiatric crisis requiring emergency intervention and hospitalization. He continues to receive treatment for clinically

1    diagnosed depression, which is directly attributable to the retaliation he endured after
2    reporting fraud.

3          **B.**     **Kaiser Aluminum Discovery and Investigation**

4      23. VMware assigned Plaintiff to manage the renewal and infrastructure modernization for
5    Kaiser Aluminum Corporation. As a supplier of critical components for the F-35 Joint Strike
6    Fighter and other U.S. defense platforms, Kaiser handles Controlled Unclassified Information
7    (CUI) and is subject to the federal data-handling requirements set forth in 32 C.F.R. § 2002.
8    Its IT systems must comply with the Defense Federal Acquisition Regulation Supplement
9    (DFARS) 252.204-7012 and NIST Special Publication 800-171.

10     24. In April 2022, Plaintiff began building a standard Technology Profile for Kaiser
11    Aluminum—a baseline EMC and VCE practice for assessing the customer environment prior
12    to proposing architectural changes. VMware's spin-out from Dell had severed historical
13    Salesforce records, and four years of rotating account managers had left no usable
14    documentation. Plaintiff reconstructed the environment using install-base reports, reseller
15    data, and internal renewal records. He knew that during Brewster's tenure at Dell EMC,
16    Kaiser had purchased a $2 million VMware Cloud Foundation (VCF) on VxRail system—
17    positioned at the time as the future of VMware adoption within Kaiser. Yet the company was
18    still running production workloads on legacy infrastructure.

19     25. By early May 2022, Plaintiff's forensic reconstruction of Kaiser Aluminum's VMware
20    estate, captured and documented in a standard Audit Map, which cross-referenced multiple
21    data sources, revealed significant discrepancies. Despite multiple ROBO license purchases
22    dating back to 2016 and possibly 2011, Kaiser's Corporate environments showed no
23    qualifying remote deployments. On May 2, LiveOptics telemetry from Kaiser's Trentwood
24    facility clarified the situation: 286 ROBO licenses were deployed across 104 CPU sockets in
25    Trentwood's primary datacenter clusters—an explicit violation of VMware's usage
26    restrictions, which limit ROBO to remote sites with no more than 25 VMs per location.

27

28

26. VMware's vSphere ROBO editions are expressly limited to use in remote physical locations—not data centers or similar environments. As defined in the VMware Product Guide, § 2.1.2:

> "You may not use more than a single 25 Virtual Machine pack of the vSphere ROBO editions in each Authorized Location. 'Authorized Locations' means Your remote physical locations but not including Your on-line stores, Your data centers, or similar types of locations."

27. The same facility housed an idle $2 million VMware Cloud Foundation (VCF) on VxRail system—provisioned with 7.7 TB RAM and 1,152 GHz of CPU—left unused while Kaiser continued operating on mislicensed infrastructure.

28. The Trentwood facility is where aluminum components for the F-35 Joint Strike Fighter are manufactured. The VCF system in that facility included NIST-compliant security controls and automated compliance validation, yet remained idle. Despite having more than twice the required capacity, Kaiser continued to run F-35 production workloads on ROBO-licensed hosts with no equivalent safeguards—placing Controlled Unclassified Information (CUI) at heightened risk.

29. Plaintiff's review also uncovered more than 1,000 critical or high-severity vulnerabilities on F-35 manufacturing systems. The Tennalum 7068 cluster was running a recalled release of ESXi, withdrawn by VMware due to serious security issues. Additional vulnerabilities included an internet-exposed Oracle data-warehouse API, a Fortinet firewall manager affected by known remote code execution flaws, and a significant number of End-of-Life Operating Systems. Each vulnerability was associated with a system processing CUI, resulting in an expansive and exploitable attack surface.

30. Plaintiff further identified a pattern of interstate wire fraud. Between 2016 (possibly 2011) and 2022, Kaiser transmitted false license counts by email between Washington, Tennessee, and California on at least twelve occasions. The data in those emails did not match

COMPLAINT

actual deployments. These false transmissions continued even after both Kaiser and VMware were presented with the accurate licensing records on May 19, 2022—supporting a finding of deliberate misconduct rather than administrative oversight.

31. Although DFARS 252.204-7012 and NIST SP 800-171 apply to any contractor handling F-35 CUI, Kaiser's SEC Form 10-K claims it is subject only to a "risk-based, multi-layered information security approach … including many of the best practices of the NIST Cybersecurity Framework." Plaintiff's audit demonstrated that Kaiser had not implemented the required technical safeguards, rendering that public statement materially misleading while the company continued to process CUI for critical defense programs.

32. In a well-governed technology company, internal control audits are routine: teams regularly inventory hardware and software, verify license counts, and reconcile drift before a formal external review. Plaintiff had participated in and led dozens of such internal audits and followed that standard sequence—evidence first, targeted audit next—when he flagged fraudulent licensing, cybersecurity gaps, and SEC-relevant disclosure issues. Senior Director Michael Brewster, who had never personally run an audit, responded with visible alarm and insisted that "non-compliance can only be established after a formal audit," a position that inverts accepted practice and contradicts VMware's own tooling, which is designed to detect violations in real time. By blocking an immediate internal review, Brewster exposed VMware to Sarbanes-Oxley and False Claims Act liability. Confronted with management's circular logic and refusal to act, Plaintiff escalated his findings to VMware's compliance team.

### C.    Internal Reporting and Suppression

33. On 4 May 2022, Plaintiff met by video with Neil Velasco, VMware's Compliance Lead for the Americas, to walk through the company's audit-trigger criteria. Plaintiff shared the Kaiser licensing and security data—complete counts, serial numbers, and ROBO-license misclassifications—showing that VMware's own thresholds for a formal audit had already been met. Velasco agreed, remarking that Plaintiff had "effectively conducted an audit" and

confirming the dataset's accuracy. Yet Velasco opened no compliance ticket, escalated nothing, and initiated no remediation.

34. In a follow-up Microsoft Teams chat that same day at 9:11 AM PST, Velasco wrote: "About half of our audits are sales-nominated, but we never let the customers know that." The admission confirmed that VMware's purported "random audit" program was in part a sales tool—exposing the company to potential fraud claims from customers who had previously been audited under false pretenses.

35. Despite Velasco's validation, Managers Hoke and Brewster moved to suppress the issue. At 9:57 AM PST on May 11, 2022, Hoke emailed Plaintiff: "Confirm counts with Tom Ervin… and Mike Wood at Trentwood," despite knowing those self-reported numbers were false. Had Plaintiff complied, he would have falsified records and actively enabled the ongoing fraud.

36. On May 18, 2022, at 11:34 AM PST, Kaiser's Director of Technology Operations, Tami Mills, emailed Plaintiff requesting a renewal status, in a thread titled *'Kaiser Aluminum VMware Renewal and Licensing Compliance.'* Plaintiff responded on May 19, 2022, at 9:11 AM PST, stating that a standard renewal was not possible because "Kaiser Aluminum as an entity is not in compliance. This needs to be resolved ASAP." He included his audit master-map in the reply, showing: (i) Kaiser Corporate held 66 licenses but was using 82; and (ii) Trentwood was operating 286 ROBO licenses across 104 CPU sockets in its primary datacenter. That map remained quoted in the body of the email and visible to all recipients in each subsequent reply—placing every participant on clear notice of the violations. (See Ex. A)

37. Plaintiff refused Hoke's directive to accept Kaiser's self-reported license counts because submitting data he knew to be false—while systems handling F-35 data remained exposed—would constitute wire fraud and potentially false claims and fraud against the United States. With Kaiser subject to DFARS requirements for handling Controlled

Unclassified Information (CUI), knowingly falsifying compliance data exposed all participants to potential federal criminal liability.

**D.    Retaliation and Termination**

38. Within days of Plaintiff's 19 May disclosure, VMware placed him on paid administrative leave—no notice, no investigation, no stated reason. Just before the leave took effect, Plaintiff warned Trentwood system administrator Ricardo Linares and IT manager Michael Wood that VMware now knew Kaiser was misusing ROBO licenses. Linares replied, "We'll have to bring in Legal." The same week, Senior Director Michael Brewster told Plaintiff that Wood had asked VMware to remove him from the Kaiser account and advised, "You should use this time to find another job." No performance deficiencies were cited; the removal served only one purpose—silencing the sole VMware employee who refused to accept Kaiser's falsified licensing data.

39. At 11:35 a.m. PDT on 25 May 2022, Kaiser's Director of Technology Operations, Tami Mills, e-mailed Plaintiff for a status update and triggered his automatic out-of-office reply. Three minutes later, at 11:38 a.m., she forwarded the entire thread—including Plaintiff's audit map detailing a confirmed six-year pattern of licensing violations—to Jeremy Hoke with the note, "We need assistance." By 11:41 a.m. Hoke had taken control, replying, "Yes, I would love to help get this sorted out." He immediately tasked Senior Solutions Engineer James Reale—Plaintiff's technical partner—to obtain Kaiser's own inventory numbers, i.e., the same self-reported figures Plaintiff had already rejected as materially misleading. Reale reported that he had "worked with the KA-TWD team to re-validate their inventory numbers" so VMware would have "accurate counts for KA," even though those numbers were the very data Plaintiff had challenged. On 3 June 2022, in that same e-mail chain, Hoke wrote: "Just had final approvals and quotes are coming over to Matt now," thereby completing the renewal based on the disputed data preserved in the thread containing Plaintiff's fraud findings. (See Ex. A)

40. On June 28, 2022, while Plaintiff was on paid administrative leave with full system access, a VMware HR representative called and provided vague reasons for impending termination. When Plaintiff stated he had retained counsel, the HR representative abruptly ended the call. Within thirty minutes, Plaintiff's access to all VMware systems—including Outlook, Teams, and OneDrive—was revoked without warning. Shortly thereafter, Senior Director Michael Brewster texted Plaintiff requesting his personal contact information and attorney's details "to forward to HR." Despite Plaintiff immediately providing this information, Brewster responded only with a Gmail address for an "employee relations consultant" named Joni Ambrosi. Attempts to contact this address failed as undeliverable. The following day, June 29, 2022, VMware terminated Plaintiff's employment without any termination letter, exit documentation, or contact with his counsel. Four months later, in response to counsel's October 17, 2022 request for personnel records under California Labor Code § 1198.5, VMware's Employment Counsel for the Americas produced only routine onboarding forms—no arbitration agreement, no investigation report, no witness statements, and no documented basis for termination.

### E.    Damages and Aftermath

41. Plaintiff's termination destroyed substantial business value. With a long record of transformative success—including 385% quota attainment at Cisco and product strategies later adopted company-wide at Cisco and at Dell EMC—Plaintiff had identified and was actively executing a significant VMware Cloud on AWS (VMConAWS) opportunity across his territory. His customer service excellence was legendary in the industry—so exceptional that Legal Bytes – a band of Big Law technology executives including a former ILTA President – recorded a tribute song about his HyperFlex solution.

42. Plaintiff had developed a repeatable playbook for turning underperforming accounts into multi-million-dollar revenue streams, as demonstrated by his early results and detailed in his March 2022 State of the Business memo. At age 49, with three decades of enterprise experience, Plaintiff was positioned for advancement to executive leadership—a natural

progression that his trajectory at VMware would have accelerated. The termination eliminated not only immediate commissions but also long-term career advancement toward senior roles in which his combined expertise in technical architecture and enterprise sales would have commanded substantially higher compensation.

43. Termination set off a steep, dangerous decline in Plaintiff's health. During the summer of 2022 he twice reached life-threatening crisis points but recovered on his own. A third and more severe episode in February 2023 alarmed close friends, led to an emergency psychiatric hold, and was followed by a March 2023 hospitalization for kidney complications. Plaintiff entered sustained clinical treatment for major depression in mid-2023 and, after medication adjustments in mid-2024, remains under care. These medical crises trace directly to the trauma of being dismissed for refusing to take part in fraud.

44. The combined effects of reputational damage, medical crisis, and lack of explanation surrounding his termination left Plaintiff unable to secure comparable employment for approximately one year. When he did return to work, it was in a lower-level role outside the VMware ecosystem—permanently altering his career trajectory and long-term earning capacity. Comprehensive economic modeling of these losses will be presented through discovery and expert testimony.

## QUI TAM DISCLAIMER

45. Plaintiff does not assert any qui tam claim. This action is brought solely in his personal capacity under the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h), and applicable state law. Plaintiff does not seek to bring any claim on behalf of the United States and expressly disclaims any intent to pursue a qui tam action under 31 U.S.C. § 3730(b). Although Plaintiff previously consulted with counsel regarding potential qui tam claims, he has knowingly and voluntarily waived any such claims, choosing to focus this case exclusively on personal retaliation and conspiracy to retaliate.

46. This disclaimer is made to avoid any inference that this action triggers the jurisdictional or procedural requirements of a qui tam proceeding, including but not limited to sealing, service on the Attorney General, or government intervention under 31 U.S.C. § 3730(b).

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### Retaliation in Violation of the False Claims Act
### (31 U.S.C. § 3730(h))
### (Sebastian Rako v. VMware LLC)

47. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

48. At all relevant times, Defendant VMware LLC ("VMware") was Plaintiff's employer within the meaning of 31 U.S.C. § 3730(h). Managers Jeremy Hoke and Michael Brewster acted on VMware's behalf and within the scope of their employment; their conduct is therefore imputed to VMware under principles of agency and respondeat superior.

49. Section 3730(h) prohibits an employer from discharging, suspending, threatening, harassing, or otherwise discriminating against an employee because of lawful acts undertaken in furtherance of a False Claims Act action or in efforts to stop one or more violations of the Act.

50. To state a retaliation claim under § 3730(h), a plaintiff must plausibly allege that (a) he engaged in protected activity; (b) the employer knew of that activity; and (c) the employer took adverse action because of it. (*Moore v. California Institute of Technology*, 67 F.4th 1021, 1028–29 (9th Cir. 2023)).

51. Plaintiff's protected activity was both a motivating factor and a but-for cause of the adverse action, satisfying either standard.

52. **Protected Activity.** Plaintiff undertook the following lawful acts to stop what he reasonably believed were violations of the False Claims Act:

a) Investigated and documented a multi-year pattern of VMware licensing fraud by Kaiser Aluminum, a defense-supply contractor.

b) Reported those findings to VMware Compliance and Senior Manager Neil Velasco, who validated the audit.

c) Refused Manager Hoke's directive to process knowingly false self-reported license counts, after warning Manager Brewster that doing so could implicate VMware in wire-fraud felonies.

d) Informed Kaiser's procurement lead that the renewal could not proceed until compliance issues were resolved.

e) After VMware management reviewed clear evidence of Kaiser's DFARS/NIST non-compliance, refused to participate in further renewals that would perpetuate the fraud.

53. **Reasonableness of Belief**. By early 2022, Plaintiff was aware that Kaiser supplied aluminum plates and parts for the F-35 program—work the Department of Defense classifies as Controlled Technical Information under DoDI 5200.48. Subcontracts handling such data must implement DFARS 252.204-7012, which in turn requires full implementation of the 110 NIST SP 800-171 controls and an accurate self-assessment score in the Supplier Performance Risk System (SPRS).

54. Plaintiff personally observed:

a) One node of Kaiser's SAP production cluster and all nodes of the Tennalum F-35 cluster running ESXi 7.0 Update 3 builds that VMware had formally withdrawn from distribution on November 19, 2021, due to critical upgrade-blocking defects;

b) Other nodes running ESXi 6.5 Update 3g, a build past its November 15, 2021 End-of-General-Support date and affected by unresolved critical CVEs; and

c) Widespread use of mislicensed "ROBO" editions. Together, these conditions violated NIST SP 800-171 controls 3.4.1 (baseline configuration) and 3.4.2 (configuration inventory), by operating recalled or unsupported software that could not receive security patches and by failing to maintain an accurate version inventory.

COMPLAINT

55. Public enforcement activity reinforced the materiality of such violations:

   a) The Department of Justice's October 6, 2021, Civil Cyber-Fraud Initiative press release announced it would pursue FCA actions against contractors who "knowingly misrepresent cybersecurity practices," and

   b) On April 27, 2022, DOJ announced a $9 million FCA settlement with Aerojet Rocketdyne for false cybersecurity certifications.

56. Kaiser's Form 10-K states it "follows the National Institute of Standards and Technology Cybersecurity Framework" and "regularly engages independent third parties" to test its controls. Public investors and DoD stakeholders rely on that assertion.

57. Plaintiff's audit showed the above statement to be false, further supporting his belief that Kaiser's SPRS score—and the Lockheed Martin payment certifications derived from it—were materially misleading. Renewing unlicensed ROBO keys under these circumstances would "cause to be presented" a false claim. Plaintiff's refusal to process the renewal was therefore protected activity under 31 U.S.C. § 3730(h).

58. **Legal Standard.** An FCA retaliation claim requires only that the employee hold an objectively reasonable belief that a violation may be occurring, mastery of DFARS flow-down mechanics or subcontractor liability doctrines would not be required. (*Moore*, 67 F.4th at 1029).

59. A reasonable person who observed a defense contractor operating F-35 manufacturing systems on recalled, untracked, and unlicensed software—especially after DOJ's October 2021 warning—could conclude that federal fraud was underway.

60. Employer Knowledge. VMware, through Managers Hoke and Brewster, had actual knowledge of Plaintiff's protected activity:

   a) Plaintiff's audit findings were shown to Hoke, Brewster, and VMware Compliance by May 4, 2022.

   b) Hoke and Brewster reacted with visible alarm and instructed Plaintiff not to escalate further.

   c) Hoke expressly ordered Plaintiff to accept Kaiser's false data, which Plaintiff refused. (See Exhibit A – May 11, 2022, email from Hoke to Plaintiff, instructing him to use Kaiser's self-reported numbers which had been shown to be wrong a week prior.)

   d) Hoke and Brewster criticized Plaintiff immediately after he advised Kaiser of its non-compliance.

61. **Retaliatory Acts**. On or about May 25, 2022, VMware removed Plaintiff from the Kaiser account and placed him on administrative leave. However, VMware failed to deactivate his corporate email and collaboration access, allowing him to continue receiving internal messages related to the Kaiser renewal after he had been sidelined.

62. VMware terminated Plaintiff's employment on June 29, 2022, without offering any coherent explanation.

63. After Plaintiff's removal, Manager Hoke took over the Kaiser renewal and processed the same false data Plaintiff had refused to submit. (See Exhibit A, Hoke's email response to Mills)

64. **Causation.** The close temporal proximity between Plaintiff's protected activity and his removal and termination, coupled with the sequence of retaliatory events described above, supports a reasonable inference that the adverse actions were taken because of his protected activity.

65. **Damages**. As a direct and proximate result of VMware's retaliation, Plaintiff has suffered lost wages, commissions, and benefits; diminished earning capacity; emotional distress; and reputational harm.

66. Pursuant to 31 U.S.C. § 3730(h)(2), Plaintiff seeks reinstatement (or front pay in lieu thereof), double back pay with interest, compensation for special and general damages, litigation costs, and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
### Retaliation in Violation of California Labor Code § 1102.5
### (Whistleblower Protection)
### (Sebastian Rako v. VMware LLC)

---

67. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

68. California Labor Code § 1102.5 prohibits an employer, and any person acting on the employer's behalf, from retaliating against an employee for disclosing information to a person with authority to investigate or correct what the employee reasonably believes to be a violation of state or federal law.

69. Under § 1102.5—as interpreted by *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 713–15 (2022)—a plaintiff need only show that protected activity was a contributing factor in the employer's decision. The burden then shifts to the employer to prove, by clear and convincing evidence, that it would have taken the same action for legitimate, independent reasons.

70. **Protected Activity.** Plaintiff engaged in the following protected disclosures:

a) Reported to VMware Compliance Lead for the Americas Neil Velasco that Kaiser Aluminum's IT environment was in material violation of federal licensing and cybersecurity laws.

b) Provided Managers Jeremy Hoke and Michael Brewster with audit findings and warned that accepting Kaiser's self-reported data could constitute wire-fraud felonies.

c) On May 19, 2022, informed Kaiser Aluminum's IT management and procurement leads that the renewal could not proceed until licensing violations were resolved, thereby refusing to participate in conduct Plaintiff reasonably believed to be unlawful.

d) Repeatedly refused directives to falsify or ignore licensing and compliance violations.

71. **Employer Knowledge and Retaliation.** VMware, through Managers Hoke and Brewster, had actual knowledge of Plaintiff's disclosures and:

a) Removed Plaintiff from the Kaiser account and placed him on administrative leave on or about May 25, 2022, while leaving his internal email and collaboration access active;

b) Terminated Plaintiff's employment on June 29, 2022, without any coherent explanation. Although Manager Brewster stated that he would relay counsel's contact

COMPLAINT

information to Human Resources, VMware issued no termination letter, conducted no investigation, and created no exit documentation.

72. On October 17, 2022, Plaintiff's attorney submitted a request for personnel records under Cal. Lab. Code § 1198.5(a). VMware produced only routine onboarding forms and a single W-2 (despite two tax years being implicated), along with two mislabeled pay slips. No termination letter, investigation file, or corrective action record was included.

73. **Causation**. Plaintiff's protected activity was a contributing factor in the adverse actions taken against him. The timing of the removal and termination, the hostile reactions from management, and the immediate transfer of the Kaiser renewal to Manager Hoke support an inference of retaliatory motive. Plaintiff believes and on that basis alleges that VMware would not have taken the same actions absent Plaintiff's whistleblowing.

74. **Damages and Relief**. As a direct and proximate result of VMware's retaliation, Plaintiff has suffered lost wages, commissions, benefits, diminished earning capacity, emotional distress, and reputational harm. Pursuant to California Labor Code § 1102.5, as well as §§ 1198.5(k) and 226(e), and applicable case law, Plaintiff seeks reinstatement or front pay, compensatory damages, statutory penalties, punitive damages, and reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION
**Civil Conspiracy to Retaliate Against Whistleblower and Facilitate Wire Fraud**
**(Derivative of Labor Code § 1102.5 and 31 U.S.C. § 3730(h))**
**(Sebastian Rako v. Kaiser Aluminum Corporation, Mike Wood, Tami Mills, Jeremy Hoke, and Michael Brewster)**

75. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

76. **Formation of the Conspiracy**. On May 19, 2022, Plaintiff disclosed to Kaiser and VMware personnel that Kaiser was operating in material violation of federal licensing and cybersecurity regulations. He attached detailed audit documentation showing systemic compliance failures. (See Ex. A) Mike Wood, as IT Lead at Kaiser's Trentwood facility, and directly responsible for the servers identified in the audit, and was made aware of VMware's

knowledge Plaintiff in a phone call with Ricardo Linares, Wood's direct report, a few days earlier.

77. Managers Jeremy Hoke and Michael Brewster reacted with hostility, expressing that they were "livid about the audit" and its findings—evidence of shared intent to suppress Plaintiff's compliance disclosure.

78. Tami Mills and representatives of Kaiser Procurement received Plaintiff's findings, including his statement that Kaiser was "not in compliance" and required immediate remediation. Wood, in particular, had already been on notice that the licensing and deployment practices under his supervision violated VMware's licensing restrictions.

79. On information and belief, within days of the May 19 disclosure, the Conspiracy Defendants—faced with audit findings that threatened to expose years of licensing fraud—coordinated to silence Plaintiff, expedite a back-channeled renewal quote, and continue transmitting false licensing data across state lines (California, Tennessee, Washington), thereby preserving the fraudulent licensing status quo for purposes of cost avoidance, concealment, and professional self-preservation.

80. **Common Objective.** The Conspiracy Defendants shared a common objective: (a) to retaliate against Plaintiff for his protected whistleblowing activity; and (b) to systematically evade accountability through suppression, concealment, and procedural manipulation.

81. Each Defendant stood to benefit from suppressing the audit findings:

   a) The Kaiser Defendants avoided substantial licensing remediation costs and internal accountability.

   b) The VMware Defendants avoided triggering a formal audit that could damage customer relationships, expose systemic licensing failures, and interfere with short-term revenue capture.

82. **Overt Acts in Furtherance.** In furtherance of the conspiracy—and within days of Plaintiff's protected disclosure—the Conspiracy Defendants committed the following overt

acts. These were not isolated business decisions but coordinated steps toward a shared unlawful objective:

a) On or about May 25, 2022, Michael Brewster authorized Plaintiff's removal from the Kaiser account and placement on administrative leave.

b) On May 25, 2022, Tami Mills contacted VMware to facilitate the renewal process while still ignoring Plaintiff's audit findings. Frist to Plaintiff and, after receiving an Out-of-Office notification, three minutes later to Hoke. (See Ex. A – "Jeremy, we need assistance.")

c) At 11:41 AM the same day—just minutes after receiving the forwarded email—Jeremy Hoke assumed control of the account and replied, "Yes, I would love to help get this sorted out," initiating the renewal process using the same false data Plaintiff had rejected. (See Ex. A – Hoke's reply to Mills)

d) On or about May 25, 2022, Mike Wood, or an agent acting on his behalf, provided self-reported socket counts to VMware engineer James Reale, enabling issuance of the renewal quote. (See Ex. A – Reale email to Kaiser.)

e) Reale later confirmed to Kaiser that he had "worked with KA-TWD team [and] re-validated their inventory numbers," referencing the same data Plaintiff had refused to submit. (See Ex. A – Reale email to Kaiser.)

f) Throughout late May 2022, Kaiser continued transmitting false compliance data via interstate electronic communications between Washington and California, despite being on notice of the audit findings.

g) On June 3, 2022, Jeremy Hoke confirmed to Kaiser that "final approvals" had been secured and that renewal quotes had been transmitted—effectively completing the fraudulent renewal. (See Ex. A)

h) All Conspiracy Defendants, by virtue of their respective roles as experts in IT management, software licensing, and IT budgeting, fully understood the implications of non-compliance with software licensing and cybersecurity mandates, yet

COMPLAINT

deliberately disregarded Plaintiff's warnings and continued with the fraudulent renewal.

i) It was particularly egregious that these overt acts occurred within an email thread explicitly named "Kaiser Aluminum VMware Renewal and Licensing Compliance," which contained the verbatim statement "Kaiser as an entity is not compliant," and with the evidence of non-compliance clearly visible in every exchanged email.

83. The coordinated timing and nature of these actions, executed by defendants with specific expertise in the relevant fields and amidst explicit warnings within a clearly labeled compliance thread, indicate they were undertaken not as isolated business decisions, but in furtherance of a shared, audacious retaliatory objective: to silence Plaintiff and perpetuate an ongoing scheme of licensing fraud.

84. **Damages.** As a direct and proximate result of this conspiracy, Plaintiff suffered indivisible harm including lost wages, commissions, emotional distress, and reputational damage—damages recoverable under Labor Code § 1102.5(f) and 31 U.S.C. § 3730(h)(2).

85. Plaintiff seeks joint and several liability against all Conspiracy Defendants for compensatory damages, punitive damages, attorneys' fees, and such other relief as the Court deems just and proper. (See *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994) ("All who participate in a civil conspiracy are jointly liable for the ensuing wrong.").

## FOURTH CAUSE OF ACTION
### Wrongful Termination in Violation of Public Policy ("Tameny Claim")
### (California common law; two-year statute of limitations under Cal. Code Civ. Proc. § 335.1)
### (Sebastian Rako v. VMware LLC)

86. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

87. Under *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980), California recognizes a common-law cause of action for wrongful termination when an employee is discharged for

engaging in conduct that public policy encourages or for refusing to engage in conduct that public policy forbids.

88. To state a claim for wrongful termination in violation of public policy, Plaintiff must show:

    a) the existence of an employer-employee relationship;

    b) termination of employment by the employer;

    c) that the termination violated a fundamental public policy; and

    d) that the public-policy violation was a substantial motivating factor in the termination.

      (See *Tameny*, 27 Cal. 3d at 172; *Yau v. Allen*, 229 Cal. App. 4th 144, 154 (2014)).

89. Plaintiff was employed by VMware as an Account Executive.

90. Plaintiff's disclosures of licensing and cybersecurity violations, and his refusal to process false data, were actions protected by the fundamental public policies embodied in California Labor Code § 1102.5 and the federal False Claims Act, 31 U.S.C. § 3730(h).

91. VMware removed Plaintiff from the Kaiser account on or about May 25, 2022, and terminated his employment on or about June 29, 2022. No investigation was conducted, no termination letter was issued, and no legitimate reason was provided.

92. Plaintiff's protected activity was a substantial motivating factor in the termination. The close temporal proximity (within 6 and 34 days, respectively), hostile managerial reactions, and the immediate transfer of the Kaiser renewal to Manager Hoke support this inference.

93. Any applicable limitations period under Cal. Civ. Proc. Code § 335.1 is subject to equitable tolling. Tolling is warranted because:

    a) VMware concealed the basis for Plaintiff's termination and failed to produce any documentation until October 2022; and

    b) Plaintiff experienced periods of medical incapacity during 2023 that impaired his ability to pursue legal action.

94. As a direct and proximate result of VMware's wrongful termination, Plaintiff has suffered lost wages, commissions, benefits, diminished earning capacity, emotional distress, reputational damage, and out-of-pocket expenses.

95. Plaintiff seeks back pay, front pay (or reinstatement), compensatory and punitive damages pursuant to Cal. Civ. Code § 3294, pre- and post-judgment interest, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

96. Wherefore, Plaintiff respectfully requests that the Court grant the following relief:

a) As to all Defendants:

- Compensatory damages for conspiracy to retaliate against a whistleblower in violation of the False Claims Act and California Labor Code § 1102.5;
- Punitive damages under California law;
- Joint and several liability for all damages arising from the conspiracy;
- Attorneys' fees and costs pursuant to applicable statutes;
- Pre-judgment and post-judgment interest;
- Costs of suit;
- Such other and further relief as the Court deems just and proper.

b) As to VMware LLC Only:

- Back pay, front pay (or reinstatement), lost commissions, and lost benefits;
- Double damages under the False Claims Act, 31 U.S.C. § 3730(h)(2);
- Damages for wrongful termination in violation of public policy (*Tameny*);
- Compensatory damages under California Labor Code § 1102.5;
- Statutory penalties under California Labor Code §§ 1198.5(k) and 226(e);
- Injunctive relief prohibiting further retaliation;
- An order requiring implementation and maintenance of proper internal channels for compliance reporting, including protections against retaliation for reporting licensing violations;

COMPLAINT

• Attorneys' fees and costs pursuant to 31 U.S.C. § 3730(h), California Labor Code §§ 1102.5 and 1198.5, and other applicable statutes.

### JURY TRIAL DEMAND

97. Plaintiff demands a trial by jury on all issues so triable.

Dated: June 18, 2025, San Jose, California

Respectfully submitted,

Sebastian Rako

Plaintiff *Pro Se*

COMPLAINT

# EXHIBIT A

**Subject:** Next Steps needed this week

**Date:** Wednesday, May 11, 2022 at 9:57:20 AM Pacific Daylight Time

**From:** Jeremy Hoke

**To:** Sebastian Rako

**CC:** James Reale

**Attachments:** image001.png

Sebastian,

Sorry the pain is so bad sir. I wanted to get these next steps nailed down so we didn't miss anything as we have some tight timelines. I know how it goes trying to battle through the pain so here to help where I can. I will work on getting brightview finished and the IB clean on Kaiser #1. Biggest things we need to accomplish in the next couple of days are below.

1. Confirm counts with Tom at Kaiser on sockets/robo/vcenter/essentials kits
2. Confirm counts with Mike at Trentwood for sockets and current other license count
3. Get forecast up to commit of 928k
4. Add notes and action plans for deals over 100k

Regards,

**Jeremy Hoke**
Sales Director – Commercial SoCal and HI
jhoke@vmware.com
Mobile: 217.721.5969



**From:** Mills, Tammy <Tammy.Mills@kaiseraluminum.com>
**Date:** Wednesday, May 18, 2022 at 11:34 AM
**To:** Ervin, Tom A. <Tom.Ervin@KaiserAluminum.com>, Sebastian Rako <srako@vmware.com>, James Reale <jreale@vmware.com>
**Cc:** Marchiondo, Michael <Michael.Marchiondo@KaiserAluminum.com>, Samuelson, Brad <Brad.Samuelson@kaisertwd.com>, Ladisa, Daniel <Daniel.Ladisa@kaiseraluminum.com>
**Subject:** RE: [EXTERNAL] Kaiser Aluminum VMware Renewal and Licensing Compliance

⚠ **External Email**

Hi Sebastian,

Any updates on our renewal?

**From:** Mills, Tammy
**Sent:** Monday, May 9, 2022 10:28 AM
**To:** Ervin, Tom A. <Tom.Ervin@KaiserAluminum.com>
**Cc:** Sebastian Rako <srako@vmware.com>; James Reale <jreale@vmware.com>
**Subject:** Re: [EXTERNAL] Kaiser Aluminum VMware Renewal and Licensing Compliance

Any updates on our renewal?

Tammy Mills
Director Technology Operations
Kaiser Aluminum-Corporate
tammy.mills@kaiseraluminum.com
Work-949-614-1749
Cell-(657) 221-5444

**From:** Sebastian Rako <srako@vmware.com>
**Sent:** Thursday, May 19, 2022 9:11 AM
**To:** Mills, Tammy <Tammy.Mills@kaiseraluminum.com>; Ervin, Tom A. <Tom.Ervin@KaiserAluminum.com>; James Reale <jreale@vmware.com>
**Cc:** Marchiondo, Michael <Michael.Marchiondo@KaiserAluminum.com>; Samuelson, Brad <Brad.Samuelson@kaisertwd.com>; Ladisa, Daniel <Daniel.Ladisa@kaiseraluminum.com>; Neilson, Matthew (Dell) <Matt_Neilson@Dell.com>
**Subject:** Re: [EXTERNAL] Kaiser Aluminum VMware Renewal and Licensing Compliance

Tammy,

Hope you are doing well. Apologies for the delayed response, I was admitted to UCLA ER last week and am still recovering.

First of all, you are in a **DnD**, which is VMware lingo for Do-not-Deny(-Support) through 2022-May-31. Case # GSS-004897, for your records. Please let me know if you run into any issues.

Long story short, we cannot simply do a "renewal" because Kaiser Aluminum as an entity is not in compliance. This needs to be resolved asap. We are working on this and have the numbers ready but we will need help from Kaiser Aluminum procurement or IT Finance, if you have such a department.

Do you think you can pull someone in?

I spoke with Dell, Insight, and Trentwood this week several times already and have calls with Dell and Insight lined up for today. I would love if we can put something on the calendar for tomorrow or early next week to give you clear numbers and options for you to deliberate.



**From:** Mills, Tammy
**Sent:** Wednesday, May 25, 2022 11:35 AM
**To:** 'Sebastian Rako' <srako@vmware.com>; Ervin, Tom A. <Tom.Ervin@KaiserAluminum.com>; James Reale <jreale@vmware.com>
**Cc:** Marchiondo, Michael <Michael.Marchiondo@KaiserAluminum.com>; Samuelson, Brad <Brad.Samuelson@kaisertwd.com>; Ladisa, Daniel <Daniel.Ladisa@kaiseraluminum.com>; Neilson, Matthew (Dell) <Matt_Neilson@Dell.com>; Samuelson, Brad <Brad.Samuelson@kaisertwd.com>; Gray, Sharon <Sharon.Gray@kaiseraluminum.com>; Marchiondo, Michael <Michael.Marchiondo@KaiserAluminum.com>
**Subject:** RE: [EXTERNAL] Kaiser Aluminum VMware Renewal and Licensing Compliance

Sebastian,

Can we get more information on what you mean by *"Long story short, we cannot simply do a "renewal" because Kaiser Aluminum as an entity is not in compliance."*

I have included our procurement folks on this. We need to get this resolved as soon as possible.

Thank you

**Tammy Mills**

---

**From:** Mills, Tammy <Tammy.Mills@kaiseraluminum.com>
**Sent:** Wednesday, May 25, 2022 11:38 AM
**To:** Sebastian Rako <srako@vmware.com>; Ervin, Tom A. <Tom.Ervin@KaiserAluminum.com>; James Reale <jreale@vmware.com>; Jeremy Hoke <jhoke@vmware.com>
**Cc:** Marchiondo, Michael <Michael.Marchiondo@KaiserAluminum.com>; Samuelson, Brad <Brad.Samuelson@kaisertwd.com>; Ladisa, Daniel <Daniel.Ladisa@kaiseraluminum.com>; Neilson, Matthew (Dell) <Matt_Neilson@Dell.com>; Samuelson, Brad <Brad.Samuelson@kaisertwd.com>; Gray, Sharon <Sharon.Gray@kaiseraluminum.com>; Marchiondo, Michael <Michael.Marchiondo@KaiserAluminum.com>
**Subject:** RE: [EXTERNAL] Kaiser Aluminum VMware Renewal and Licensing Compliance
**Importance:** High

⚠ External Email

Jeremy,

We need assistance in getting the correct information to resolve this issue to get support.

Thank you

**Tammy Mills**
**Kaiser Aluminum - Corporate**
**Director of Technology Operations**
Office: 949-614-1749
Cell: 657-221-5444

EXHIBIT A TO COMPLAINT  p. 5

**From:** Jeremy Hoke <jhoke@vmware.com>
**Sent:** Wednesday, May 25, 2022 11:41 AM
**To:** Mills, Tammy <Tammy.Mills@kaiseraluminum.com>; Sebastian Rako <srako@vmware.com>; Ervin, Tom
A. <Tom.Ervin@KaiserAluminum.com>; James Reale <jreale@vmware.com>

**Cc:** Marchiondo, Michael <Michael.Marchiondo@KaiserAluminum.com>; Samuelson, Brad
<Brad.Samuelson@kaisertwd.com>; Ladisa, Daniel <Daniel.Ladisa@kaiseraluminum.com>; Neilson,
Matthew (Dell) <Matt_Neilson@Dell.com>; Samuelson, Brad <Brad.Samuelson@kaisertwd.com>; Gray,
Sharon <Sharon.Gray@kaiseraluminum.com>; Marchiondo, Michael
<Michael.Marchiondo@KaiserAluminum.com>
**Subject:** RE: [EXTERNAL] Kaiser Aluminum VMware Renewal and Licensing Compliance

Tammy,

Yes I would love to help get this sorted out.  Do you have time today from 330-5 PST or tomorrow from 11-
1 to hop on a call?

Regards,

Jeremy Hoke
Sales Director – Commercial SoCal and HI
jhoke@vmware.com
Mobile: 217.721.5969

Rako <srako@vmware.com>; Ervin, Tom A. <Tom.Ervin@KaiserAluminum.com>
Cc: Marchiondo, Michael <Michael.Marchiondo@KaiserAluminum.com>; Samuelson, Brad
<Brad.Samuelson@kaisertwd.com>; Ladisa, Daniel <Daniel.Ladisa@kaiseraluminum.com>; Neilson,
Matthew (Dell) <Matt_Neilson@Dell.com>; Samuelson, Brad <Brad.Samuelson@kaisertwd.com>; Gray,
Sharon <Sharon.Gray@kaiseraluminum.com>; Marchiondo, Michael
<Michael.Marchiondo@KaiserAluminum.com>
Subject: RE: [EXTERNAL] Kaiser Aluminum VMware Renewal and Licensing Compliance

Hi Tammy/Team,

I am the Engineer working on the technical side of VMware for KA/KA-TWD.

I'm working with Jeremy to verify the VMware inventory numbers we have for KA and KA-TWD. I believe
we are good and I know this may have been done, but I'm just doing a quick validation with the teams. I've
worked with KA-TWD team re-validate their inventory numbers. Just wanted to make sure we have
accurate counts for KA as well.

Once 100%, Jeremy and team will work to get you the official quotes/info you need to move this forward. I
know there are questions around the portal to ensure appropriate license access for KA / KA-TWD entities.
This is on the list to discuss with you.

ASK:  Is there someone on your team I can work with to verify the KA numbers we have in the attached
spreadsheet in the Summary-KA tab? Should be a quick 30min discussion. More or less making sure we
captured your environment correctly.

While this is being worked on, please have your team reach out to me if you any technical support
problems as I can make sure they are getting assistance.

James

-
James Reale
*Senior Solutions Engineer*
**vm**ware, Southern California
jreale@vmware.com
949.648.6554 Mobile

**From:** Jeremy Hoke <jhoke@vmware.com>
**Sent:** Friday, June 3, 2022 3:11 PM
**To:** Mills, Tammy <Tammy.Mills@kaiseraluminum.com>; James Reale <jreale@vmware.com>; Sebastian Rako <srako@vmware.com>; Ervin, Tom A. <Tom.Ervin@KaiserAluminum.com>
**Cc:** Marchiondo, Michael <Michael.Marchiondo@KaiserAluminum.com>; Samuelson, Brad <Brad.Samuelson@kaisertwd.com>; Ladisa, Daniel <Daniel.Ladisa@kaiseraluminum.com>; Neilson, Matthew (Dell) <Matt_Neilson@Dell.com>; Gray, Sharon <Sharon.Gray@kaiseraluminum.com>
**Subject:** RE: [EXTERNAL] Kaiser Aluminum VMware Renewal and Licensing Compliance

Tammy,

Just had final approvals and quotes are coming over to Matt now.  We will have everything over early next. I apologize for the delays as we worked through the install base.

Regards,

Jeremy Hoke
Sales Director – Commercial SoCal and HI
jhoke@vmware.com
Mobile: 217.721.5969



**From:** Mills, Tammy <Tammy.Mills@kaiseraluminum.com>
**Sent:** Friday, June 3, 2022 3:05 PM
**To:** James Reale <jreale@vmware.com>; Jeremy Hoke <jhoke@vmware.com>; Sebastian Rako <srako@vmware.com>; Ervin, Tom A. <Tom.Ervin@KaiserAluminum.com>
**Cc:** Marchiondo, Michael <Michael.Marchiondo@KaiserAluminum.com>; Samuelson, Brad <Brad.Samuelson@kaisertwd.com>; Ladisa, Daniel <Daniel.Ladisa@kaiseraluminum.com>; Neilson, Matthew (Dell) <Matt_Neilson@Dell.com>; Gray, Sharon <Sharon.Gray@kaiseraluminum.com>
**Subject:** RE: [EXTERNAL] Kaiser Aluminum VMware Renewal and Licensing Compliance

⚠ External Email

Jeremy/Sebastian,

Are we close to getting an appropriate renewal quote that will be processed through Insight?